Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

1) STEPHEN PARMENTER,           )
                                )
          Plaintiff,            )
                                )
     -vs-                       ) Case No. 19-CV-431-TCK-JFJ
                                )
2) CITY OF NOWATA, OKLAHOMA,    )
                                )
          Defendant.            )
                                )

* * * * * * * * * * * * * * * * * *

DEPOSITION OF MELANIE COLLINS

TAKEN ON BEHALF OF THE PLAINTIFF

TAKEN AT 114 SOUTH MAPLE STREET

NOWATA, OKLAHOMA

JUNE 23, 2020

* * * * * * * * * * * * * * * * * *

BALLARD REPORTING
611 WEST 15TH STREET, C-3
TULSA, OKLAHOMA  74127
(918) 407-2278
ballardreporting@gmail.com

* * * * * * * *

REPORTED BY:  ASHLEY BALLARD, CSR

Page 18

1  A. "For over five years, up until April 8, 2019,
2     Plaintiff was the non-probationary fire chief of the
3     City of Nowata which was subject to 11 O.S.
4     Subsection 29-104."
5  Q. Do you agree with that assertion?
6        MR. LeBLANC: Objection to the form; calls for
7     a legal conclusion.
8  Q. (By Mr. Frasier) Now, remember, Judge Kern isn't
9     here to call balls and strikes. Mr. Thomas makes
10    his record -- we're in federal court; I should say
11    Mister. Counsel makes his record and then the judge
12    will rule on it later. That lets this thing go on
13    without having to call the judge; okay?
14 A. Okay.
15 Q. So let me ask you: Do you agree with that
16    allegation in paragraph 4?
17       MR. LeBLANC: Object to the form; calls for a
18    legal conclusion.
19 Q. (By Mr. Frasier) Please answer.
20       MR. LeBLANC: If you know the answer.
21 A. I don't know how long he was the fire chief for
22    sure. I don't know.
23 Q. (By Mr. Frasier) Do you think he was fire chief
24    for the five years prior to April 2019?
25 A. I don't know.

Page 19

1  Q. All right.
2  A. I know he was the fire chief from '17 to '19.
3  Q. Was he the fire chief before you started here?
4  A. I don't know.
5  Q. You don't remember --
6  A. I believe he was.
7  Q. Okay.
8  A. I know he was when I came.
9  Q. And when you came, do you think that he was the
10    probationary or temporary fire chief?
11 A. No.
12 Q. You think he was probably the permanent fire chief?
13 A. Yes.
14 Q. Okay. And do you know what Oklahoma -- are you
15    familiar with Oklahoma statutes?
16 A. I have to go read them, but I defer to counsel
17    because I don't know them.
18 Q. Okay. And do you know what Title 11 of the
19    Oklahoma statutes Section 29-104 is?
20 A. I do not.
21 Q. All right. Have you, even since this case began,
22    looked it up?
23 A. No, sir, I have not.
24 Q. Do you know if it applies to firefighters or city
25    managers?

Page 20

1  A. I don't know.
2  Q. Okay. Paragraph number 5, would you read that for
3     us, please.
4  A. "On April 8, 2019, Plaintiff was terminated without
5     cause and with neither pre-termination nor
6     post-termination procedures."
7  Q. All right. Do you know or agree with any of the
8     assertions made in paragraph number 5?
9  A. I do not agree with that.
10 Q. And what is it that you disagree with?
11 A. Mr. Parmenter was terminated with cause and he had
12    multiple pre-termination hearings and he received
13    his termination process. I don't agree with that at
14    all.
15 Q. Okay. So tell me then what the cause was of his
16    termination.
17 A. There were a lot of reasons.
18 Q. Please provide them.
19 A. Do you have a copy of his first reprimand, please?
20 Q. I do --
21 A. Can I ask for that?
22 Q. -- someplace in this mess. Do you not recall off
23    the top of your head?
24 A. I cannot recall all of them off the top of my head.
25 Q. Okay.

Page 21

1  A. Some of them were morale, time sheets. But without
2     looking at that, right off the top of my head, those
3     are the two that -- but the morale was the biggest.
4  Q. Okay. And what is it with the morale? That he
5     inspired morale? He was a --
6  A. No.
7  Q. Okay.
8  A. No.
9  Q. Tell me about it then.
10 A. The morale was horrible in the department. It
11    ended up affecting two departments. It never got
12    better.
13 Q. All right.
14 A. It was destroying those two services.
15 Q. All right. So you believe that he was having a
16    negative impact on morale?
17 A. Yes.
18 Q. All right. What was he doing that was having a
19    negative impact on morale?
20       I should say it this way: What was he doing
21    or not doing that was having a negative impact on
22    the morale?
23 A. He was not listening to his employees. It was the
24    my-way-or-the-highway attitude that he had. And it
25    was just ongoing. There was fear of retribution and

Page 30

1  A. Okay.
2  Q. Well, while we're doing that, I can kind of work
3     simultaneously. I'm putting before you Exhibit No.
4     2. Are you familiar with that document?
5  A. Yes.
6  Q. What is that document?
7  A. City of Nowata Personnel Manual, 2012.
8  Q. All right. And was that the city manual in place
9     when you came to work here?
10 A. Yes.
11 Q. Has it changed over the years?
12 A. There's been one revision to it.
13 Q. All right. Have you seen Exhibit No. 3 before?
14 A. Yes.
15 Q. And what is Exhibit No. 3?
16 A. Chief McElhaney's statement.
17 Q. And when did he give that to you?
18 A. March 5th or 6th of 2019.
19 Q. All right. And is it dated?
20 A. It is dated March 5, 2019.
21 Q. And why did he give it to you?
22 A. He witnessed what he felt was unjust and brought it
23     to my attention.
24 Q. Did you ask him to write that document?
25 A. No, I did not.

Page 31

1  Q. Do you know where he wrote that document?
2  A. No, I do not.
3  Q. You would agree with me that document is not
4     notarized?
5  A. It is not.
6  Q. And could have been done at any time, couldn't it?
7  A. I don't know.
8  Q. Could have been done after this litigation
9     commenced; right?
10    MR. LeBLANC: Object to the form of the
11    question.
12    If you didn't understand his question, tell
13    him you didn't understand. If you have an answer --
14    I think he is asking you to guess or speculate,
15    but...
16 A. Can you clarify your question?
17 Q. (By Mr. Frasier) Sure. Why didn't the chief just
18    tell you?
19 A. That, I don't know.
20 Q. Of course it's going to be right here under my
21    nose. There's just a few papers in this case.
22 A. Just a little bit.
23 Q. Do you agree with me that Mr. Parmenter did not
24    have a post-termination hearing of any kind?
25 A. Post-termination?

Page 32

1  Q. Right.
2  A. How do you define post-termination?
3  Q. Well, post would mean after he was terminated from
4     his employment.
5  A. Yes, he did.
6  Q. He did?
7  A. Yes.
8  Q. Explain that to us.
9  A. He came -- I had him come into my office. He was
10    terminated. He had an opportunity to speak. That
11    is post, after the termination. Yes, he had his --
12 Q. Okay. But he didn't have an opportunity to talk to
13    the city council or anybody else in Nowata
14    government other than --
15 A. I don't make those determinations.
16 Q. -- other than you?
17 A. Right. Yes.
18    MR. LeBLANC: Occasionally you've started your
19    answer while Mr. Frasier is still asking his
20    question. Just be a little bit patient and let him
21    get the question all the way out, then give him his
22    answer. And he will do the same for you, you know,
23    let you finish your answer completely before he
24    starts the next question. It makes Ashley's life so
25    much easier.

Page 33

1     THE WITNESS: Okay.
2     MR. FRASIER: We don't want to make her mad.
3     THE WITNESS: No, we don't want to make her
4     mad.
5  Q. (By Mr. Frasier) Okay. If you would look to the
6     second page of Exhibit 1, paragraph number 6. Why
7     don't you read that for us, please.
8  A. "As a result of this violation of Plaintiff's civil
9     rights, he has lost wages and other benefits of
10    employment, including harm to his retirement, has
11    lost his job, and endured humiliation and emotional
12    distress."
13 Q. Okay. You understand that my client believes that
14    he was wrongfully terminated?
15 A. Yes.
16 Q. And do you agree or disagree with that?
17 A. I disagree.
18 Q. Okay. Now, as the fire chief for Nowata, we know
19    he was paid because we know that at sometime, from
20    what you circled on Exhibit 4, he was paid how much?
21 A. $1,880 every two weeks.
22 Q. All right. Did he have any other benefits of
23    employment here?
24 A. Yes.
25 Q. Like what?

Page 50

1  A. It's a memo that I sent to all the department
2     heads.
3  Q. Okay. And why did you do that?
4  A. I had recently been appointed as the interim city
5     manager and I wanted to let them kind of know what
6     my expectations were and to address some issues that
7     had been going on without pointing out any one
8     person specifically.
9  Q. And when you say the department heads, who is that?
10 A. The fire chief, the police chief, Jerry Jackson, at
11    the time it would have been Jerry Martin, and Roger
12    Smith in public works.
13 Q. Okay. And I'm sorry, I should have asked this
14    before: On Exhibit No. 5, was there anybody who was
15    present when you gave that to Mr. Parmenter?
16 A. Christopher Emert.
17 Q. And who is that person?
18 A. He was the code enforcement officer at the time.
19 Q. Why did you have him witness?
20 A. Anytime you're giving a reprimand, you should have
21    a witness.
22 Q. Okay.
23 A. It's always a good idea to have.
24 Q. Just a best practice?
25 A. Uh-huh.

Page 51

1  Q. Is that yes?
2  A. Yes. Yes.
3  Q. All right. We have been going about an hour. What
4     do you say we take a break? Would you like that?
5  A. That sounds great.
6        (Whereupon, a short break was taken.)
7  Q. (By Mr. Frasier) All right. We're back on the
8     record. We've had a break. Hopefully we're warmer.
9  A. Yes.
10 Q. Okay. Great.
11       Let me ask you: Looking at Exhibit 7, how
12    long had you been -- at that point, were you --
13    strike that. Let me ask it better.
14       Were you interim city manager or were you the
15    official city manager when you wrote Exhibit 7?
16 A. Interim.
17 Q. Okay. And you became -- I think your testimony was
18    roughly three months/90 days later, you became the
19    actual -- or six months?
20 A. Six months.
21 Q. Six months. So it would have been into 2018 that
22    you became...
23 A. Yes.
24 Q. So when you wrote that memo that is Exhibit 7, how
25    long had you been interim city manager?

Page 52

1  A. Not very long. I don't remember an exact time. It
2     wasn't very long.
3  Q. Okay. And that's fair. I'm not wanting to know if
4     it had been 14 days or if -- I mean would it have
5     been a matter of --
6  A. About a month.
7  Q. About a month?
8  A. About a month.
9  Q. Okay. Looking at Exhibit 5, you wrote up
10    Mr. Parmenter within 30 days of your becoming
11    interim city manager; is that right?
12       MR. LeBLANC: Object to the form.
13 A. Yes.
14 Q. (By Mr. Frasier) And had you had some prior
15    history or issues with Mr. Parmenter before you
16    became the interim city manager?
17 A. Yes.
18 Q. Tell me about that, please.
19 A. When I was doing the city clerk and I was doing the
20    time sheets, there were issues. They weren't
21    getting turned in on time. He was changing the
22    people's times and I had told him he couldn't do
23    that. And I brought it to the city manager's
24    attention and I know the city manager spoke with him
25    about it.

Page 53

1  Q. And how is it that you know that? Were you
2     present?
3  A. I heard it through the wall.
4  Q. Okay. Is the fire chief responsible for turning in
5     the time sheets for the employees of the EMS and
6     fire department?
7  A. Yes.
8  Q. And why was he changing the time sheets, if you
9     know?
10 A. I don't know.
11 Q. What was wrong with him changing the time sheets?
12 A. It's illegal. The employee has to do it.
13 Q. Okay. And how do you know that?
14 A. That was one of the HR things I did know.
15 Q. Okay. When you overheard that conversation, you
16    were city clerk?
17 A. Yes.
18 Q. And you weren't in a position to hire or fire city
19    personnel in that job, are you?
20 A. No.
21 Q. How many times did you bring changes to the time
22    sheets to the city manager's attention?
23 A. A couple of times. I don't know an exact number.
24 Q. Do you know how many times he had discussions with
25    Mr. Parmenter?

14 (Pages 50 to 53)

16a95b2a-1ba2-4c84-a4fe-8644304084f4

**Page 58**

1  Q. Why is hers handwritten? And is that in your
2     handwriting?
3        MR. LeBLANC: What's the page number, please?
4        MR. FRASIER: I'm sorry.
5        THE WITNESS: Nowata 052.
6        MR. LeBLANC: Thank you.
7  A. This is not my handwriting.
8  Q. (By Mr. Frasier) Okay. Let me ask you: Were you
9     friends with Nancy Brooks?
10 A. I have work relationships with everybody. I don't
11    go in the evenings and have dinner with any of the
12    employees.
13 Q. Attend church or anything --
14 A. No.
15 Q. -- like that?
16 A. No. I go to work. I go home. I don't socialize
17    with the employees after work.
18 Q. All right. In looking at Exhibit 5 -- let me find
19    mine here in this mess. All right. Looking under
20    Details, it reads Description of Infraction, and
21    then it was altering of employee time sheets.
22 A. Uh-huh.
23 Q. Now, you told me that he was altering the
24    employees' time sheets.
25 A. Uh-huh.

**Page 59**

1  Q. And how is it you know that he was altering the
2     employees' time sheets?
3  A. Part of them were Whited-Out and it was his -- he
4     would handwrite in -- you could tell it was his
5     handwriting and not theirs.
6  Q. Was the alteration a falsification?
7  A. I don't remember.
8  Q. Okay.
9  A. It's been too long ago. I don't remember.
10 Q. Would you expect him to turn in correct time
11    sheets?
12 A. I would expect him to, yes.
13 Q. All right. You would agree with me that you could
14    make an alteration to a time sheet to make it
15    correct from incorrect; right?
16 A. No, the employee has to do that.
17 Q. No, no, no. I want you to hear my question.
18 A. Okay.
19 Q. Someone can change/alter a time sheet making it
20    correct if it was incorrect?
21 A. No.
22 Q. Okay. And that's because the employee has to do it
23    his or her --
24 A. Yes.
25 Q. -- self?

**Page 60**

1  A. Yes.
2  Q. All right. The next allegation here reads:
3     "Falsification of own time sheet."
4     Did I read that correctly?
5  A. Yes.
6  Q. Tell me what that means.
7  A. He wrote down hours that he was at work when he
8     wasn't at work.
9  Q. And how do you know that?
10 A. This was when Charlie was here and Charlie
11    addressed this with him. He said he was at work.
12    He wrote down that he was at work, when, in fact,
13    other employees seen him not at work and called
14    Charlie and reported it.
15 Q. Okay. So between August 1st and August 31st, how
16    many times did you find that he was falsifying his
17    own time sheets?
18 A. That was the one time I know about.
19 Q. The one time was when your predecessor was city
20    manager and you heard it through an office wall --
21       MR. LeBLANC: Object to the form.
22 Q. (By Mr. Frasier) -- or an open door?
23       MR. LeBLANC: Object to the form.
24       You can answer it if you can.
25 Q. (By Mr. Frasier) Let me rephrase it. This

**Page 61**

1     reference to a falsification of the time sheet did
2     not happen when you were city manager, did it?
3  A. No.
4  Q. It did not happen when you were interim city
5     manager, did it?
6  A. No.
7  Q. It's something that you overheard and you were not
8     a party to the conversation.
9        MR. LeBLANC: Object to the form.
10 Q. (By Mr. Frasier) Isn't that correct?
11 A. Yes, I was not in the room during the conversation.
12 Q. All right. You overheard it; you eavesdropped,
13    didn't you?
14 A. They were screaming through the wall. You could
15    hear.
16 Q. You overheard it or eavesdropped, didn't you?
17 A. Yes.
18 Q. Yes or no.
19 A. Yes.
20 Q. Now, that happened when?
21 A. When Charlie Spencer was city manager.
22 Q. 2015? 2013? 2012?
23 A. End of 2016 ot beginning of 2017.
24 Q. Okay.
25 A. Sometime in January.

Page 74

1  Q. Okay.
2  A. It was there when I started.
3  Q. Okay.
4  A. I mean it was already there. That was already --
5     that was ongoing.
6  Q. But what I'm looking for is a specific instance
7     between August 1st and August 31st.
8  A. I can't remember a specific instance.
9  Q. All right.
10 A. It was ongoing. It was every day that they felt
11    like this and the morale was bad.
12 Q. Well, we know it was sometime into 2019 because you
13    did this survey.
14 A. Uh-huh.
15 Q. Correct?
16 A. Uh-huh.
17 Q. Yes?
18 A. Yes.
19 Q. So how did you know the morale was bad in the
20    department between August 1st and August 31st of
21    2017?
22 A. Because the employees had talked to me about it.
23 Q. And how often did they do that?
24 A. It was several times. I don't know an exact
25    number.

Page 75

1  Q. All right. More than a dozen?
2  A. Within the time frame from when I started as city
3     clerk to this point, I would say probably, yes, a
4     dozen.
5  Q. All right. What about the time frame when you
6     became city manager?
7  A. It was still off and on, ongoing. It was just
8     random when they would come in; so I don't know a
9     specific number.
10 Q. Do you recall any specifics about any one thing
11    they may have said or one person may have said?
12 A. "My way or the highway."
13 Q. Okay. And you told somebody it was your --
14 A. "You do this or you're not going to have a job."
15 Q. Okay. Those were directives you gave?
16 A. No. Those were what was brought to me by the
17    employees.
18 Q. Okay. And --
19 A. Favoritism.
20 Q. Okay. "My way or the highway." Who said, "My way
21    or the highway"?
22 A. Steve did.
23 Q. Steve Parmenter?
24 A. Uh-huh. That was -- the employee that brought that
25    to me said that that was the mentality; that's how

Page 76

1     Steve was with them. Whenever they would bring
2     concerns to him, he didn't care; he wouldn't listen.
3     "It's my way or the highway," that was the
4     mentality.
5  Q. And which employee told you that?
6  A. Nancy Delmas.
7  Q. And when did she tell you that?
8  A. Oh, my gosh. Multiple times all the way back.
9     They've all told me that at one time or another.
10 Q. Do you recall an instance when Nancy told you that
11    between August 1st and August 31st?
12 A. Not between August 1st and August 31st, no.
13 Q. So that's information that you knew before you were
14    interim city manager?
15 A. Yes.
16 Q. All right. Did Nancy have a problem with comp time
17    or not getting comp time?
18 A. I believe she was included in -- she was one of the
19    ones that was negative in the hours.
20 Q. Okay. Was she disciplined for that?
21 A. The ones that were negative, we came up with a plan
22    for them to fix it, to pay for those hours.
23 Q. Okay. Nobody lost his or her job?
24 A. No.
25 Q. You had also said -- in addition to "my way or the

Page 77

1     highway," I think your other information was that -
2     and I don't want to misquote you; you tell me if I'm
3     wrong - that he wouldn't listen and was
4     unsympathetic is generally what I heard. Is that
5     correct?
6  A. Yes. He wouldn't listen to them. He wouldn't take
7     their issues into consideration. He blew them off.
8  Q. Okay.
9  A. They all felt like they were blew off.
10 Q. All right. And that created, in your opinion, low
11    morale?
12 A. Yes.
13 Q. All right. The next item is creating feelings of
14    fear of retribution or retaliation in employees in
15    the department, creating a harassing, hostile, and
16    threatening work environment for employees.
17 A. Yes.
18 Q. Tell me about that, please.
19 A. When the employees would come to me with these
20    complaints or these concerns or this had happened or
21    that had happened and I would tell them, "Okay.
22    Well, I need you to document that. I need you to
23    write down what happened," nobody would write down
24    anything, because they said that Steve would
25    retaliate against them; that he had done it in the

Page 78

1  past and he would do it again.
2  Q. Okay.
3  A. Nobody wanted to document anything because they
4    were scared to death of being retaliated against.
5  Q. And tell me, did they give you any examples, any
6    names of people who had been retaliated against?
7  A. They felt like they had been before in the past.
8  Q. Okay.
9  A. But they wouldn't give me specific --
10 Q. But they never lost their job?
11 A. No.
12 Q. And they apparently were given comp time.
13 A. Uh-huh.
14 Q. Which is against the city policy; right?
15 A. Yes.
16 Q. So here you've got the chief of the fire department
17   who is apparently -- sounds like Shrek, to hear you
18   say it, but he is giving them comp time when they're
19   not supposed to have it.
20 A. Yes.
21 Q. It's kind of a mixed signal, wouldn't you agree?
22     MR. LeBLANC: Object to the form.
23 Q. (By Mr. Frasier) Please answer.
24     MR. LeBLANC: Same objection.
25 A. Yes.

Page 79

1  Q. (By Mr. Frasier) Okay. Noncompliance with hiring
2    policy.
3  A. Yes.
4  Q. Tell me about that, please.
5  A. He hired without going through the proper channels.
6    He actually ended up doing the hiring and not the
7    city manager.
8  Q. All right. And --
9  A. He did everything and -- yep.
10 Q. Can you give me a specific instance?
11 A. When I was the city manager he done it. I can't
12   remember the exact employee that he hired at that
13   time. And that's why this memo was sent.
14 Q. Okay.
15 A. That's part of why this memo was sent.
16 Q. And "this memo" is Exhibit 7?
17 A. Exhibit 7, yes.
18 Q. Okay. So you were interim city manager and he
19   hired somebody he shouldn't have or tried to hire
20   somebody he shouldn't have?
21 A. He did hire them.
22 Q. Who did he hire?
23 A. I don't remember the person's name.
24 Q. All right. Do they still work for the City?
25 A. I don't believe so.

Page 80

1  Q. When did they leave?
2  A. I don't remember. EMS has a lot of turnover.
3  Q. Why is that?
4     MR. LeBLANC: Object to the form.
5  Q. (By Mr. Frasier) I mean if you know. If you
6    don't, you don't.
7  A. I don't know.
8  Q. Okay. We'll talk about that later.
9     The next one is holding volunteer pay until
10   dues are paid.
11 A. Uh-huh.
12 Q. Explain that to me.
13 A. We do volunteer pay once a month, and it had come
14   to my attention that Steve was holding their checks
15   and wouldn't give them their checks until after they
16   paid their dues, or they could pick their check up
17   and go cash it and bring the money straight back to
18   him for the dues, or to the treasurer, whoever.
19 Q. Okay. First, this begs the question: Volunteer?
20   Getting paid? Tell me about that. Why do
21   volunteers get paid in Nowata?
22 A. Our volunteers get a certain amount per run
23   depending on what the run is. And at the end of the
24   month, we pay them for the runs that they've done.
25 Q. Okay. And that's kind of a misnomer around the

Page 81

1    state, that the volunteer firefighters -- they
2    really kind of get a reimbursement for their gas and
3    their time, don't they?
4  A. Call it whatever you want. I don't know. All I
5    know is that's how it works.
6  Q. I hear you. I hear you.
7     What dues was he holding out?
8  A. I don't know. I think it was the volunteer fire
9    dues that they have to pay.
10 Q. Maybe some union dues?
11 A. I don't know.
12 Q. Was there ever a time when there was a problem of
13   paying into the firefighter pension while
14   Mr. Parmenter was chief?
15 A. I don't know.
16 Q. Did he ever bring to your attention an issue with
17   monies not being paid into the pension?
18 A. Not that I remember.
19 Q. Okay. "Scheduling part-time workers more than
20   part-time hours."
21     Did I read that correct?
22 A. Yes.
23 Q. And tell me about that, please.
24 A. The part-time workers were working full-time hours
25   and sometimes getting overtime.